REID, Judge.
Sam Joseph Russo, Jr. instituted this action against Wilkerson J. Eschete and his liabilty insurer, St. Paul Fire and Marine Insurance Company, seeking to recover $47,000 in damages for injuries allegedly sustained in an automobile accident which occurred November 30, 1965, in the city of Houma, Terrebonne Parish, Louisiana.
Plaintiff alleges that at about 8:35 A.M. on November 30, 1965, he was driving a 1964 Plymouth Tudor Sedan, owned by Walter A. Blanchard, Jr., in a westerly direction on Bond Street in Houma, Louisiana ; that at the same time the defendant, Wilkerson J. Eschete, was driving his 1960 Studebaker Fordor Sedan in a northerly direction on Lee Avenue; and when plaintiff’s vehicle reached the intersection of Bond Street and Lee Avenue it was struck from the side by the Eschete vehicle, resulting in damages to the vehicle plaintiff was driving and serious injuries to himself. The petition alleges there was no traffic control sign at the intersection controlling traffic on Bond Street, on which he was traveling, but there was such a sign on Lee Avenue, on which the defendant was traveling. The injuries allegedly sustained by plaintiff were multiple severe abrasions and contusions, severe lacerations to the face and forehead which required numerous sutures, severe lacerations to the scalp and left ear which also required numerous sutures, pronounced deflection of the nasal septum, and an extremely severe tear in the cartilage of the left knee which required corrective surgery.
St. Paul Fire and Marine Insurance Company filed its answer and admitted the existence of its policy of liability insurance at the time of the accident. It denied that the defendant Wilkerson J. Eschete was guilty of any negligence and alleged contributory negligence on the part of the plaintiff.
Wilkerson Eschete was never served and, therefore, was not before the Court.
After trial of the matter and for oral reasons assigned, judgment was rendered, read and signed in open court on November 25, 1968, in favor of the plaintiff, Sam Joseph Russo, Jr., and against St. Paul Fire and Marine Insurance Company, in the sum of $2,154.00, together with legal interest from November 28, 1966, and all costs. The expert fee of Dr. Philip R. Cenac was fixed at $100.00 and taxed as cost. Plaintiff was granted a devolutive appeal on February 6, 1969.
The appellant complained of three errors made by the trial Judge, as follows: (1) That he erred in holding that the torn medial meniscus of the left knee which Sam J. Russo, Jr. sustained was not the direct result of the automobile accident of November 30, 1965; (2) that he erred in not awarding the entire amount of medical expenses which Sam J. Russo, Jr. incurred, particularly such expenses as were incurred by virtue of the surgery required to repair the torn medial meniscus of the left knee, an injury which was received in the said accident in point; and (3) the award of $2,000.00 of the trial court was totally inadequate for the injuries, pain, suffering and future disability incurred by Sam J. Russo, Jr. as a result of the injuries which the court in fact considered, as well as the torn medial meniscus of the left knee, which the court disallowed.
There is no question of liability as the defendant took no appeal, nor has it answered the appeal herein. The only issue left is the question of quantum, which deals largely with the question of whether or not • the torn medial meniscus was the result of the automobile accident and if *322 so the quantum of damages to which plaintiff would be entitled as the result of said injury.
The trial Judge rendered no written reasons for judgment but the minutes show that when he handed down his decision he held “there being no connection between the accident and knee injury.” He awarded $2,000.00 for special injuries and limited the medical bills “to those visits with reference to injuries related to the accident, deleting that part from bill as regards the said knee injury.”
After the accident the plaintiff was taken to the Terrebonne General Hospital where he was treated by Dr. Philip Cenac. His main complaints then were about his head injury, the abrasions, contusions and lacerations to his face and forehead which required sutures, and severe lacerations to the scalp and left ear which also required numerous sutures, and a pronounced deflection of the nasal septum.
At that time plaintiff failed to inform Dr. Cenac of any injury to his knee. Dr. Cenac was mainly concerned with his head injury and plaintiff continuously complained of headaches. When plaintiff was taken to the Terrebonne General Hospital he spent about two hours in the emergency room where Dr. Cenac, a surgeon, sutured his head lacerations. He returned home and was in bed for about one week and he returned to Dr. Cenac for his first post accident visit on December 7, 1966, when the stitches were removed.
Dr. Cenac had three check-up visits with the plaintiff and sent him to Dr. Hagen for complaints of ear trouble, and Dr. Bal-done for some possible trouble with his eyes. Both of these doctors gave him negative reports and found nothing wrong with plaintiff in their respective specialties.
Plaintiff continued his athletic activities, playing basketball in the fall and he stated that in December of 1965 while in- a basketball game “I jumped up one time and came down on my leg and just fell to the floor.” This was some two months after the automobile accident. It was afterward that he complained of his knee injury.
Plaintiff continued to engage in the athletic activities of basketball and softball and it was not until November 2, 1966 that he complained of his knee injury.
Dr. Cenac testified that the knee injury could have just as well resulted from the basketball accident as from the automobile accident.
The plaintiff testified under cross examination that he was admitted to the emergency room of the Terrebonne General Hospital on October 5, 1966, for a broken nose and that he had received the broken nose while he was playing touch football at a trade school.
As a result of Dr. Cenac’s examination of the plaintiff on November 2, 1966, when he first received the complaint of the knee injury, he sent plaintiff to Dr. E. J. Dabez-ies, an orthopedic specialist. Dr. Dabezies' found the torn meniscus and plaintiff was hospitalized. Dr. Dabezies, assisted by Dr. Cenac, operated on plaintiff’s knee. He had a normal and uneventful recovery. He was in a cast for two or three weeks after the operation and was on crutches for about one month. He also stated that he resumed his normal activities two or three months after this operation by Dr. Dabezies.
After the operation plaintiff played basketball again with á regular team during the winter season and finished out the season. In the following spring of 1967 he started playing softball and he played throughout the entire season. In the fall of 1967 he and some friends made up their own basketball team and played the full season of 1967-1968. When baseball season came in again in the spring of 1968, he again played.
Plaintiff went to a trade school and in the beginning of 1968 he went to work for the Main Iron Works. He was not requir *323 ed to take a physical examination and worked for them a few months.
In March of 1968 he secured a job with Western Electric Company in Houma, installing electrical equipment. This required a physical examination which was made by Dr. McIntyre of Houma. He noted the operative site on the left knee, examined it and passed plaintiff for full employment. This job required him to climb ladders. He had no complaints from his employer, Western Electric, about his work and it can be assumed that the same was satisfactory.
It is interesting to note that at the time Dr. Cenac examined plaintiff for his head injuries he tested his reflexes by tapping on both knees with a rubber hammer and Dr. Cenac testified that he had normal reflexes and that if this test had hurt plaintiff he would have cried out or drawn the doctor’s attention to it.
The defendant placed a Mr. L. P. Le-moine on the stand, an adjuster employed by Strattman & Lemoine, Independent Adjusters, who attempted to adjust plaintiff’s claim following the automobile accident. He testified that he saw the plaintiff three or four times during the year following the accident and in addition contacted his stepfather and mother, with whom he lived, some ten or twelve times in an attempt to adjust the claim. At no time in his discussion of the injuries and of the adjustment of the claim was any complaint made about the leg or knee injury at all. The only complaint concerned the slight laceration of the head and of having headaches. The first time Lemoine knew of the alleged knee injury was when an insurance agent who wrote the policy, advised him on November 21, 1966, that plaintiff was now claiming that he had also hurt his knee.
Plaintiff lived with his stepfather and mother, Mr. and Mrs. Blanchard, but he did not produce them as witnesses to prove or to testify as to what they knew of injuries he received in the accident. If he had received the knee injury in the accident, we are sure that his parents would have had some knowledge of it and could have corroborated his testimony. However, he failed to produce them on the stand and they did not mention the knee accident to Mr. Lemoine, the adjuster.
In view of these facts we are satisfied that the trial Judge was justified in disallowing the claims for the knee injury and the medical expenses in connection with that injury.
The trial Judge was requested to examine the scars on the plaintiff and he stated he could not see the scar on plaintiff’s forehead from where he was sitting. But when plaintiff approached the Judge’s desk he was able to see a slight scar. He also had his attention called to a slight scar on plaintiff’s ear.
The trial Judge saw fit to award compensation for the pain and suffering by an award of $2,000.00 plus the medical expenses of $154.00. We do not see where he abused his discretion in making these awards.
For the above and foregoing reasons, the judgment of the trial Court is affirmed at appellant’s cost.
Affirmed.